IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AMIN MOHAMED BASHER HASSAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:14cv1190 (LMB/TRJ) |
| | ) | |
| JEH CHARLES JOHNSON, Secretary of Homeland Security, and SARAH TAYLOR, District Director, USCIS Washington District Office, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Petitioner Amir Mohamed Basher Hassan ("petitioner" or "Hassan"),[1] an Egyptian national, has filed a motion for summary judgment in which he seeks an order reversing the decision of the U.S. Citizen and Immigration Services ("USCIS" or the "agency"), which denied his naturalization application. The USCIS has filed its own motion for summary judgment seeking an affirmance of its decision.[2] Hassan has properly exhausted his administrative remedies, making the issues in the parties' motions ripe for adjudication. For the reasons discussed briefly in open court and in more detail below, the defendants' motion for summary judgment will be granted and petitioner's motion will be denied.

---

[1] The named defendants are Jeh Charles Johnson, the Secretary of Homeland Security, and Sarah Taylor, the District Director of the USCIS Washington District Office (collectively "defendants").

[2] Although Hassan filed a brief in support of his motion, he did not file a brief in opposition to the agency's motion for summary judgment. Counsel for Hassan also failed to appear in court when the motions were set for oral argument; however, as the Court explained in open court and explains in this opinion, given the uncontested facts in the administrative record, oral argument would not have assisted the decisional process.

I.      BACKGROUND

A. **Stipulated Facts**

Hassan is a citizen of Egypt who first entered the United States in 1999, Stip. Facts ¶ 1, as a nonimmigrant visitor for business, Pet., Ex. 4 at 2. He married a United States citizen, Debra Horn-Hassan ("Ms. Horn-Hassan"), on January 21, 2003, in Maryland and they subsequently moved to Virginia.[3] Stip. Facts ¶ 2. Hassan became a lawful permanent resident ("LPR") of the United States on October 19, 2004, based on his wife's American citizenship. Id. ¶ 3. Both Hassan and Ms. Horn-Hassan are members of the Muslim faith and had planned to raise a family together, but they were unable to conceive a child. Pet. ¶ 8.

While visiting his family in Egypt, Hassan's family encouraged him to seek a second wife, as allowed under Egyptian law, in order to have children. Id. Hassan consulted with his American wife, who agreed to the second marriage. Id. On October 18, 2007, Hassan married his second wife, Suhila Fatju Arby Hamid ("Ms. Hamid"), in Egypt. Stip. Facts ¶ 4. They continue to be married, and they have three children together, all of whom live with their mother in Egypt.[4] Id. ¶ 5; Pet., Ex. 2 at 6. Hassan maintained relationships with both spouses by spending most of his time in the United States, although he visited Egypt five times between October 10, 2007, and June 3, 2012, for a total of 515 days. See Pet. ¶ 8; Pet., Ex. 2 at 4 (listing Hassan's travel outside of the United States). The record also shows that Ms. Horn-Hassan

---

[3] Hassan also had a prior marriage to a U.S. citizen, Elizabeth Todd, which lasted from November 2001 until Ms. Todd's death in March 2002. Pet., Ex. 4 at 2.

[4] Although the parties stipulated that Hassan and Ms. Hamid have two children, one born in 2008 and one in 2009, Hassan's naturalization application (attached to his petition) has been edited by hand to include a third child who was born in August 2012, two months after Hassan filed the application. Pet., Ex. 2 at 6. Presumably, Ms. Hamid is the mother of Hassan's third child as the child resides with her in Egypt. Id.

moved out of the marital home one week after Hassan returned in January 2008 after his marriage in Egypt. See Pet. ¶ 8; Pet., Ex. 4 at 2. They divorced on March 19, 2012. Stip. Facts ¶ 6.

### B. USCIS Decisions

Hassan applied for naturalization on June 6, 2012, truthfully disclosing on his application that he had previously been married to two women concurrently. Stip. Facts ¶¶ 7-8. He attached a letter to his application stating that when he married Ms. Hamid, he did not intend to bring her or any children they would have together to the United States but that he might decide to bring them to the United States in the future now that he was divorced from Ms. Horn-Hassan. Id. ¶ 8 (citing Pet., Ex. 2, Addendum).

His application was denied by the USCIS Washington District Office on May 30, 2013, on the ground that he had "engaged in a polygamous marriage" within the five-year statutory period,[5] which adversely reflected upon his moral character. Pet., Ex. 3 at 2 (initial denial letter). The denial letter explained:

> Polygamy is the practice or condition of having more than one spouse, especially wife, at one time. An applicant who has practiced polygamy or is practicing polygamy during the statutory period is precluded from establishing GMC [good moral character].

Id. In support, the letter cited to § 101(f) of the Immigration and Nationality Act ("INA")[6] and 8

---

[5] Hassan does not dispute that the applicable statutory period is five years. Because he indicated on his naturalization application that he is not married to a U.S. citizen or applying on the basis of qualifying military service, his application is considered under 8 U.S.C. § 1427, which requires that an applicant not lack good moral character during the five years immediately preceding the day he applies for naturalization. See 8 U.S.C. § 1427(a).

[6] Paragraph (f) of INA § 101, which has been codified at 8 U.S.C. § 1101, provides a list of characteristics, including engaging in polygamy, that would preclude a person from meeting the good moral character standard.

C.F.R. § 316.10(b)(2)(ix).[7]

On June 28, 2013, Hassan requested a hearing on the initial denial of his application. A hearing was held in October 2013, after which the USCIS affirmed the denial of his application in a decision dated November 18, 2013. Stip. Facts ¶ 10 (citing Pet., Ex. 4). The decision mainly rested on Hassan having engaged in a polygamous marriage during the five-year period and stated that polygamy was against the public policy of the United States. See Pet., Ex. 4 at 3-4 (letter affirming the denial on appeal). The USCIS highlighted that Hassan had not presented any evidence that attitudes in the United States towards polygamy had changed or that polygamous marriages had become commonly accepted either in the United States or in Hassan's Northern Virginia community. Id. at 4. Moreover, the decision described bigamy as a crime in 49 states—including Virginia—and the District of Columbia.[8] Id. To rebut Hassan's argument that his conduct did not actually violate Virginia's law against bigamy because he neither married nor resided with Ms. Hamid in Virginia, the USCIS decision quoted case law from the Supreme Court of Virginia holding that neither the place of the second marriage nor the place of cohabitation is an element of the offense of bigamy. Id. at 3 (quoting Farewell v. Commonwealth, 189 S.E. 321, 323 (Va. 1937)).

---

[7] This regulation provides: "An applicant shall be found to lack good moral character if during the statutory period the applicant: . . . (ix) Has practiced or is practicing polygamy[.]" 8 C.F.R. § 316.10(b)(2)(ix).

[8] In its letter, the USCIS explained the difference between polygamy and bigamy as follows:
> [A]ccording to the Board of Immigration Appeals (BIA), "the words polygamy and polygamist refer to the historical custom and religious practice, which the Mormons typified in this country until the statutory abolition of the practice in the latter part of the 19th century." In contrast, immigration law defines bigamy as a "criminal act resulting from having more than one wife without benefit of prior divorce."

Pet., Ex. 4 at 2 (citations omitted) (citing a 1953 BIA decision and a provision of the Foreign Affairs Manual as updated in September 2010).

4

Finally, after explaining that the INA "sets forth a list of categories of persons who are statutorily barred from establishing good moral character," the USCIS decision emphasized that "the practice of polygamy" is explicitly listed in INA § 101(f)(3) as a statutory bar to a finding of good moral character and that 8 C.F.R. § 316(b) implements this prohibition. Id. at 4-5. The USCIS concluded its polygamy discussion with, "regardless of whether practiced abroad or in the United States, polygamy is a bar to [a] finding of good moral character," if practiced during the statutory period. Id. at 5.

In addition to rejecting Hassan's application on the ground that he had engaged in polygamy, the USCIS found that a conviction from October 2007 for driving under the influence of alcohol ("DUI") "reflect[ed] negatively on [Hassan's] good moral character." Id. For that conviction, the Arlington County General District Court sentenced Hassan to 180 days of incarceration and 12 months of probation but he avoided serving any period of incarceration by completing the Virginia Alcohol Safety Action Program. Id. Hassan also had to pay a fine, and his driver's license was suspended for 12 months. Pet., Ex. 2 at 8. Although the DUI conviction was an adverse factor in assessing Hassan's moral character,[9] the decision also referenced Hassan having given two conflicting explanations for why he was driving under the influence. Pet., Ex. 4 at 5. On these bases, the USCIS concluded that Hassan had failed to meet his burden of demonstrating good moral character for the five years preceding the filing of his naturalization application.

---

[9] The USCIS cited 8 C.F.R. § 316.10(b)(3)(iii), which provides:
> Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant: . . . Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts . . . .

8 C.F.R. § 316.10(b)(3)(iii).

5

### C. Instant Petition

Hassan timely filed the instant three-count petition on September 9, 2014, under 8 U.S.C § 1421(c). In Count 1, he attacked the agency's regulations, which he described as "seriously out of date" and not "conform[ing] to current standards of good moral character." In Count 2, he denied being a bigamist, arguing that under Virginia law his conduct did not satisfy the elements for bigamy. In Count 3, he argued that the defendants' decision is absurd in comparison to defendants' regularly approving the applications of those who have children born out of wedlock. Hassan asks the Court to conduct a de novo review of his naturalization application and award him attorney's fees and costs pursuant to the Equal Access to Justice Act.

### II. DISCUSSION

#### A. Standards of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Nesari v. Taylor, 806 F. Supp. 2d 848, 859-60 (E.D. Va. 2011) (quoting Fed. R. Civ. P 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 860 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"In civil actions under 8 U.S.C. § 1421(c), which provides a mechanism for appealing the USCIS's denial of an application for naturalization, a district court is empowered to conduct a de novo review of the record, to hold evidentiary hearings, and to make additional factual findings." Id. Specifically, 8 U.S.C. § 1421(c) provides that a court's review of a naturalization decision "shall be de novo, and the court shall make its own findings of fact and conclusions of law." 8 U.S.C. § 1421(c). In fact, "[j]udicial review of naturalization denials is always available and is de novo, and is not limited to any administrative record, but rather may be on facts established in

6

and found by the district court." Nesari, 806 F. Supp. 2d at 860 (quoting Chan v. Gantner, 464 F.3d 289, 291 (2d Cir. 2006)).

"An applicant seeking to obtain the privilege of United States citizenship bears the burden of proof to establish that he or she is eligible for naturalization." Id. at 862 (citing Rogers v. Bellei, 401 U.S. 815, 839 (1971)). Courts, therefore, "have the power to confer citizenship only in strict compliance with the terms of an authorizing statute." Id. at 862-63 (internal quotation marks omitted) (quoting Cody v. Caterisano, 631 F.3d 136, 142 (4th Cir. 2011)). "[T]he burden is on the alien applicant to show his eligibility for citizenship in every respect, and any doubts regarding an applicant's eligibility for naturalization should be resolved in favor of the United States and against the claimant." Id. at 863 (internal quotation marks omitted) (quoting Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967)). In particular, the applicant has the burden of proving, inter alia, "that he is of good moral character." Id. (citing 8 C.F.R. § 316.10(a)(1); see also 8 U.S.C. § 1427(a) (requiring that an applicant be of good moral character for at least five years prior to the filing of his application and for the entire time that the application is pending); 8 C.F.R. § 316.10(a)(1) ("An applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character.").

The "INA does not define good moral character except by setting forth a nonexhaustive list of instances in which a person will not be regarded as one of good moral character." Iqbal v. Bryson, 604 F. Supp. 2d 822, 827 (E.D. Va. 2009) (citing 8 U.S.C. § 1101(f); 8 C.F.R. § 316.10). Consequently, "courts analyze good moral character on a case by case basis, and then must take into account the 'standard of the average citizen in the community of residence.'" Id. (quoting 8 C.F.R. § 316.10(a)(2)). The "first step is to determine whether Plaintiff's 'good moral character'

7

passes muster under sections 1101(f) or 316(b), as those sections identify specific, objective factors that indicate a lack of good moral character. Then the Court can filter Plaintiff's character through the subjective [average citizen] test under section 316(a)(2)." Id.

### B. Analysis

Hassan makes several arguments in support of his good moral character. First, he argues that Virginia's bigamy law should apply because states have primary responsibility over domestic relationships, see Mem. Supp. Pl.'s Mot. Sum. J. ("Pl.'s Mem.") 3 (citing United States v. Windsor, 570 U.S. __, 133 S. Ct. 2884 (2013)); however, he does not cite any authority to support the argument that state domestic relations law applies with the same force in the immigration context, in which federal law typically preempts state law. He then argues that, under Virginia law, he has not committed the crime of bigamy because he did not marry or cohabitate with his second wife in Virginia. Id.

> Addressing the latter part of Hassan's argument first, the relevant statute provides:
>
> If any person, being married, shall, during the life of the husband or wife, marry another person in this Commonwealth, or if the marriage with such other person take place out of the Commonwealth, shall thereafter cohabit with such other person in this Commonwealth, he or she shall be guilty of a Class 4 felony.

Va. Code Ann. § 18.2-362. As the agency explained in its decision on appeal, the Supreme Court of Virginia has clearly rejected Hassan's interpretation of the statute. See Farewell v. Commonwealth, 189 S.E. 321, 323 (Va. 1937). In Farewell, the court explained, "Either the second unlawful marriage, or the cohabitation after the second unlawful marriage has been entered into out of this State, must take place within this State to give our courts jurisdiction. Neither the place of marriage, nor the place of cohabitation, [however,] is an element of the nature or character of the crime." Id. Therefore, although Hassan could not be prosecuted for bigamy in Virginia, he still

committed bigamy under Virginia's definition of the offense by his "entering into of the second unlawful marriage while [he] had a lawful wife still living."[10] Id.

Hassan's bigamy argument fails for a second reason because a state criminal statute is not controlling for purposes of interpreting and applying federal naturalization laws. The Fourth Circuit has held that the federal definition of applicant classes barred from a good-moral-character finding enjoys primacy over state laws. See generally Nemetz v. Immigration & Naturalization Serv., 647 F.2d 432, 435-36 (4th Cir. 1981). In Nemetz, the Fourth Circuit found that the constitutional requirement of uniformity in naturalization matters mandates that state criminal law not be relied on to define "good moral character" where inconsistent results would be reached in different states. Id. at 435; see also U.S. Const. art. I, § 8, cl. 4 (requiring a "uniform rule of naturalization"). The Nemetz court elaborated:

> In determining which crimes will preclude a finding of good moral character for naturalization purposes, federal courts can appropriately look to state law in the initial stages of the determination. When use of state law defeats the uniformity requirement, however, the court must devise a federal standard by other means.

Nemetz, 647 F.2d at 436.

Moreover, even if the reasoning in Nemetz did not defeat this argument, the INA and its implementing regulations do not require an applicant's conduct to be chargeable under state or federal law in order for that conduct to adversely reflect upon the applicant's moral character.

---

[10] When Farewell was decided, the bigamy statute was codified in section 4538 of the 1936 Code of Virginia. The 1936 version of the statute is nearly identical to the current version:

> If any person, being married, shall during the life of the former husband or wife, marry another person in this State, or if the marriage with such other person take place out of this State, shall thereafter cohabit with such other person in this State, he shall be confined in the penitentiary not less than three or more than eight years.

Farewell, 189 S.E. at 323.

9

See, e.g., 8 U.S.C. §§ 1101(f)(1) (precluding a good moral character finding if applicant is "a habitual drunkard"). Indeed, the USCIS did not find Hassan lacking in good moral character because he committed a federal or state crime of bigamy. Instead, it found him lacking in good moral character because he admittedly practiced polygamy, which is expressly listed as an exclusionary basis in both the INA and the implementing regulations. See 8 U.S.C. §§ 1101(f)(3), 1182(a)(10)(A); 8 C.F.R. § 316.10(b)(2)(ix); see also USCIS Policy Manual, Vol. 12, Part F, Ch. 5(H) (Oct. 2014) ("An applicant who has practiced or is practicing polygamy during the statutory period is precluded from establishing GMC [good moral character]. Polygamy is the custom of having more than one spouse at the same time. . . . Polygamy is not the same as bigamy. Bigamy is the crime of marrying a person while being legally married to someone else. An applicant who has committed bigamy may be susceptible to a denial under the 'unlawful acts' provision.").

Hassan argues that his conduct did not violate any law because it was legal in Egypt, where his second marriage occurred, and because he did not "practice" polygamy in the United States. Without support, he states that "[p]racticing polygamy means bringing home more than one spouse, and the spouses are considered to be part of one big family." Pl.'s Mem. 3. Because he never cohabited with both of his spouses simultaneously, he argues that he never "practiced" polygamy. Further, Hassan contends that conduct that is legal where it occurs does not automatically become conduct of bad moral character because it is illegal in the United States. Id. at 4. As an example, he points out that using marijuana in a country where it is legal does not amount to an act of bad moral character simply because it is prohibited in the United States. Id. This argument fails because, as explained above, an applicant need not have committed a crime to be found lacking in good moral character. The INA also states that the listed exclusionary

reasons are non-exhaustive and that, therefore, a person can be found lacking in good moral character "for other reasons." Id. § 1101(f).

Lastly, Hassan argues that the regulation naming polygamy as a bar to good moral character, 8 C.F.R. § 316.10(b)(2)(ix), is unreasonable and not supported under the INA. Specifically, he contends that the "INA does not provide a definition of either good moral character or bigamy/polygamy and gives no guidance to the Defendants as to the applicability of good moral character to bigamy." Pl.'s Mem. 4. This argument ignores the guidance of INA § 101(f)(3), which was specifically referenced in the USCIS's decision affirming its initial denial of Hassan's application, and which provides:

> (f) For the purposes of this Act - No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is or was—
> ...
> (3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraph[] . . . (10)(A) of section 212(a) of this Act . . . if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

INA § 101(f)(3) (codified at 8 U.S.C. § 1101(f)(3)). The class of persons described in § 212(a)(10)(A) of the INA is: "Practicing polygamists [-] Any immigrant who is coming to the United States to practice polygamy is inadmissible." INA § 212(a)(10)(A) (codified at 8 U.S.C. 1182(a)(10)(A)). Hassan does not discuss these particular statutory provisions at all in his brief.

In support of his argument that the regulation is unlawful, Hassan argues that Chevron deference does not apply, the regulation is confusing and overreaching, and the defendants' position is absurd. Hassan's bases his confusion argument on the fact that the regulation refers to "polygamy" but the USCIS's decision on appeal referred to "bigamy." That decision, however, only discussed bigamy for the purposes of explaining

11

the difference between polygamy and bigamy to Hassan and to rebut Hassan's argument that he did not technically violate Virginia's bigamy law. See Pet., Ex. 4 at 2-3.

Hassan also contends that the regulation overreaches because it mandates a finding of bad moral character for noncriminal activity. Pl.'s Mem. 5-6. As explained above, however, the INA expressly names at least one noncriminal activity as an exclusionary ground (being a habitual drunkard), and it also states that a finding of lack of good moral character can be based on other, unspecified grounds. See 8 U.S.C. § 1101(f).

Finally, he argues that the USCIS's decision is absurd because, unlike those who are found to lack good moral character for failing to provide for their children born out of wedlock, Hassan married Ms. Hamid in order to fulfill his obligation to provide a stable home for their children. Id. at 6-7. This is not the reason Hassan stated in his petition for marrying a second wife but, regardless, the regulation naming polygamy as an exclusionary ground is entitled to Chevron deference, as explained below.

Defendants argue that Chevron is irrelevant because the statutory language of the INA is unambiguous regarding polygamy, see Mem. Supp. Defs.' Opp'n Pl.'s Mot. Sum. J. & Supp. Cross-Mot. Sum. J. ("Defs.'s Mem.") 7, which is explicitly included in the list of classes of applicants who are statutorily disqualified from establishing good moral character. See 8 U.S.C. §§ 1101(f), 1182(a)(10)(A) (listing as an excluded class "[p]racticing polygamists," defined as "[a]ny immigrant who is coming to the United States to practice polygamy"). Defendants further argue that USCIS's regulation providing that an applicant lacks good moral character if the applicant "has practiced or is practicing polygamy" during the applicable statutory period preceding a naturalization

application merely implements the above statutory provisions. 8 C.F.R. § 316.10(b)(2)(ix). The Court finds that these provisions of the INA are unambiguous and that both the INA and the regulation bar granting Hassan's application.

Even if there were a question about the clarity of the INA, defendants contend that USCIS's interpretation of the INA in its implementing regulations is reasonable. Defs.' Mem. 8. Courts have held that related portions of 8 C.F.R. § 316.10(b) are entitled to Chevron deference. See, e.g., United States v. Jean-Baptiste, 395 F.3d 1190, 1194 (11th Cir. 2005) (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984)) ("[In] the final 'catch-all' section of 8 U.S.C. § 1101(f) . . . Congress delegated authority to the former INS to set forth 'other reasons' affecting determinations of good moral character. Pursuant to this authority, Congress delegated to the Attorney General authority to issue 8 C.F.R. § 316.10 . . . . This regulation is entitled to deference."); Etape v. Napolitano, 664 F. Supp. 2d 498, 507 (D. Md. 2009) (same). Moreover, as defendants argue, "Chevron deference is particularly warranted for a regulation concerning the award of U.S. citizenship, where any doubts are to be resolved in favor of the government." Defs.' Mem. 8. Although there appears to be no case law specifically discussing the reasonableness of the polygamy regulation, 8 C.F.R. § 316.10(b)(2)(ix), the Court does not find that this regulation represents an unreasonable interpretation of the INA's exclusion of "practicing polygamists."

Lastly, even if the INA were ambiguous and the regulation an unreasonable interpretation of the INA, the final step is to analyze a petitioner's character under the "standard of the average citizen in the community of residence." Iqbal v. Bryson, 604 F. Supp. 2d at 827 (quoting 8 C.F.R. § 316.10(a)(2)). Hassan has not presented any evidence showing that the average citizen of Northern Virginia would find that his

13

conduct satisfies community standards merely because he cannot be prosecuted under Virginia's bigamy statute for jurisdictional reasons. Instead, he broadly argues that perceptions of marriage are changing, as demonstrated in United States v. Windsor, but he offers no evidence regarding how average citizens of his Northern Virginia community, or average citizens of the United States, view the practice of polygamy. To the extent that Hassan suggests that the practice of polygamy requires all of the spouses to live together, see Pl.'s Mem. 3, he cites no evidence showing that the average citizen of Northern Virginia would find polygamy consistent with good moral character if the various spouses lived under different roofs.

### III. CONCLUSION

In sum, the INA expresses an unambiguous policy against practicing polygamists, the regulation is a reasonable interpretation of the INA, Hassan bears the burden of demonstrating his good moral character which he has failed to do, and any doubts regarding his eligibility should be resolved in favor of the government. For all of the reasons discussed above, the Court will grant summary judgment in favor of defendants by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 20th day of February, 2015.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge